**Anvar FARROKHI, Petitioner,**

v.

**U.S. IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 89–2938.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 30, 1989.

Decided April 3, 1990.

As Amended April 5, 1990.

Mary Witt, George Washington University Nat. Law Center Community Legal Clinic, Washington, D.C., for petitioner.

Jill E. Zengler, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, D.C., for respondent. Paul Grussendorf, George Washington University Nat. Law Center Community Legal Clinic, on brief, Washington, D.C., for petitioner.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Robert Kendall, Jr., Asst. Director, Charles E. Pazar, Office of Immigration Litigation, U.S. Dept. of Justice, on brief, Washington, D.C., for respondent.

Before HALL, MURNAGHAN, and CHAPMAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

Anvar Farrokhi appeals the affirmance by the Board of Immigration Appeals of an Immigration Judge's determination that Farrokhi is subject to deportation and has abandoned his application for asylum.

## I

### A

Farrokhi is a thirty-one year old native of Iran. He entered the United States in 1978 on a non-immigrant visa for the purpose of furthering his medical studies at the University of Nebraska. He has not attended that university or any other school since 1979.

Farrokhi has been convicted of three crimes committed in the United States. In 1985, he was convicted of stealing merchandise valued at $1.12 from a grocery store. He was fined $100 and placed on one year's probation. In January 1987 Farrokhi was convicted of passing bad checks valued at less than $300. He was sentenced to six months probation. In December 1987 he was convicted of battery on a police officer and resisting arrest. According to Farrokhi's application for asylum, he was sentenced to time served, which amounted to 271 days.

After we heard oral argument, the District Court of Maryland for Howard County "struck" Farrokhi's 1985 theft conviction on the grounds that "the Sixth Amendment requirements of the United States constitution as to notice of advice of rights to counsel ... [were] not complied with by the presiding judge." *Maryland v. Farrokhi*, No. 603246TO (Dist.Ct.Md. Jan. 19, 1990) (order striking conviction). The court ordered that "the matter shall be set back on the docket for a trial wherein [Farrokhi] may be represented by counsel." *Id.*

### B

After issuance of an Order to Show Cause why deportation should not be ordered, Farrokhi appeared before Immigration Judge Bruce M. Barrett on July 8, 1988. At the beginning of the hearing, Judge Barrett asked Farrokhi if he spoke and understood English, to which Farrokhi responded "yes." Judge Barrett also noted that, from his prior observation of Farrokhi, it appeared to him that Farrokhi understood English.

Judge Barrett asked Farrokhi if the government had provided him with a list of local counsel who could represent him for little or no fee, to which Farrokhi responded "yes." Judge Barrett asked also wheth-

er the government had given Farrokhi Form I–618, which explains his appeal rights, to which Farrokhi responded "yes." The judge also asked Farrokhi if he understood the charges against him, to which Farrokhi responded "yes." Judge Barrett then explained to Farrokhi that he had the right to an attorney, although not at cost to the government. After that, the following ensued:

> Judge Barrett: If you can't afford Counsel, you can refer to the legal aid list, or you may speak for yourself. What do you wish to do?
>
> Farrokhi: At this point, I would like to speak for me[,] for myself.

Based on Farrokhi's admissions to the government's allegations, Judge Barrett found Farrokhi to be deportable on two grounds. First, by not attending school since 1979, Farrokhi had violated his nonimmigrant status and was therefore deportable under 8 U.S.C. § 1251(a)(9);[1] second, having been convicted of two crimes of moral turpitude, Farrokhi was deportable under 8 U.S.C. § 1251(a)(4).[2] The two crimes of moral turpitude relied upon by Judge Barrett were the convictions for stealing the merchandise and for passing bad checks. As noted above, the first of these two convictions has been "stricken," although Farrokhi remains subject to retrial.

Judge Barrett then pursued the issue of asylum:

> Judge Barrett: I have found that you are subject to deportation. That does not mean that you would have to be deported. Do you have a fear of being persecuted if you go back to Iran? All you have to do is indicate slightly, sir.
>
> Farrokhi: Yes, I do.

Judge Barrett then asked if Farrokhi wanted to file an application for asylum, provided Farrokhi with an application form, informed Farrokhi that the application should be returned to him (Judge Barrett), informed Farrokhi of what the most important information in his responses would be, and informed Farrokhi of the ten-day deadline to submit the application. Judge Barrett's explanations were oral.

On August 1, 1988, thirteen days after the July 18, 1988, deadline for the submission of Farrokhi's application for asylum, Judge Barrett found that Farrokhi's application had been abandoned. In February 1989, over six months later, Farrokhi filed a late application for asylum.

During the proceedings before Judge Barrett, Farrokhi referred to his potential eligibility for legalization through the government's amnesty program. Judge Barrett explained to Farrokhi that he did not have jurisdiction to hear Farrokhi's claim.

C

Farrokhi appealed Judge Barrett's decision to the Board of Immigration Appeals ("BIA"). The only issue Farrokhi raised in his notice of appeal to the BIA was his claim that he was entitled to amnesty. He raised the possible due process implications neither of his lack of counsel nor of Judge Barrett's finding that Farrokhi had abandoned his application for asylum. Although the details are not clear, it appears from the BIA's decision that Farrokhi disputed his deportability under § 241(a)(4) of the Act. Farrokhi did not dispute his deportability under § 241(a)(9). Indeed, in support of his argument of eligibility for amnesty, Farrokhi's notice of appeal reas-

---

**1.** Title 8 U.S.C. § 1251(a)(9) provides for deportation of an alien who:

> was admitted as a nonimmigrant and failed to maintain the nonimmigrant status in which he was admitted or to which it was changed pursuant to section 1258 of this title, or to comply with the conditions of any such status. . . .

**2.** Title 8 U.S.C. § 1251(a)(4) provides for deportation of an alien who:

is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more, or who at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial. . . .

serts that he violated his student visa. The BIA held that Judge Barrett properly (1) found Farrokhi deportable under § 241(a)(4) and (2) refused to consider Farrokhi's eligibility for amnesty because jurisdiction for that decision did not lie.

### D

Although the Record before us is far from clear, it appears that Farrokhi has pursued other avenues in his quest for legalization or "amnesty." In his brief, Farrokhi contends that he has "filed a timely application for amnesty." However, Farrokhi has neither indicated to whom he filed the timely application nor included a copy of the timely application in the record. Further doubt is cast on his claim that he has filed a timely application by the fact that he has submitted a "Statement of Reasons for Not Applying for Legalization Prior to May 5, 1988 and Statement of Eligibility for Legalization" to plaintiffs' counsel in *Ayuda, Inc. v. Thornburgh*, No. 88–0625 (D.D.C.).[3] Although that document also is absent from the record, its title, combined with the absence from the record of a timely application, indicates that, contrary to the contention in his brief, Farrokhi has *not* filed a timely application for legalization. Nevertheless, Farrokhi's submission to plaintiffs' counsel in the *Ayuda* litigation indicates his ongoing attempt to obtain legalization.[4]

### E

Farrokhi now appeals the BIA decision to us, presenting for our consideration the following four claims:

1. His lack of counsel at his deportation hearing constituted a deprivation of due process;
2. Judge Barrett's use of Farrokhi's conviction for passing bad checks as a basis for deportability under § 241(a)(4) was improper;
3. Judge Barrett's finding that Farrokhi abandoned his application for asylum constituted a deprivation of due process; and
4. Farrokhi should not be deported until his eligibility for amnesty is ruled upon.

We first address the issue of whether Farrokhi has waived his right to make those claims and then reject each claim in turn.

### II

■ Title 8 U.S.C. § 1105a(c) provides that:

An order of deportation ... shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right....

As a general rule, an alien who has failed to raise claims during an appeal to the BIA has waived his right to raise those claims before a federal court on appeal of the BIA's decision. *Vargas v. U.S. Dept. of Immigration*, 831 F.2d 906, 907–08 (9th Cir.1987); *Ka Fung Chan v. INS*, 634 F.2d 248, 258 (5th Cir.1981); *Der-Rong Chour v. INS*, 578 F.2d 464, 468 (2d Cir.1978), *cert. denied*, 440 U.S. 980, 99 S.Ct. 1786, 60 L.Ed.2d 239 (1979).

However, the Ninth Circuit has developed an exception for due process claims, holding that aliens may raise such claims in the federal courts even if they have failed

---

**3.** *Ayuda* involves a challenge to certain aspects of the INS's interpretation of the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1255a, which governs applications for amnesty. The *Ayuda* plaintiffs challenged the INS's interpretation of the statutory provision that aliens are entitled to legalization only if they can demonstrate that their illegal status in the United States was "known to the government." *See* 8 U.S.C. § 1255a(a)(2)(B). The case has reached the appellate stage where the United States Court of Appeals for the District of Columbia Circuit has held that the district court lacks jurisdiction to hear the plaintiffs' claims. *See Ayuda, Inc. v. Thornburgh*, 880 F.2d 1325

(D.C.Cir.1989). Apparently, the *Ayuda* plaintiffs intend to appeal that decision to the Supreme Court.

**4.** As far as we can tell, Farrokhi never became a party to the *Ayuda* litigation. Indeed, prior to the decision of the Court of Appeals, the presiding district court judge had denied an application from Farrokhi for a stay of deportation, suggesting that the district court did not perceive the litigation before him to be determinative of Farrokhi's case. Farrokhi did not appeal that denial.

to raise them before the BIA provided that the due process claim is not merely an allegation of "procedural error" cloaked in due process language. *See Vargas, supra,* 831 F.2d at 908. The Ninth Circuit exception to the general waiver rule, based on the premise that "the BIA does not have jurisdiction to adjudicate constitutional issues," *id.,* ultimately derives from *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). *See Hernandez–Rivera v. INS,* 630 F.2d 1352, 1355 (9th Cir. 1980) (relying on *Johnson* ). However, we read *Johnson* to stand only for the proposition that "adjudication of the constitutionality of *congressional enactments* has generally been thought beyond the jurisdiction of administrative agencies." *Johnson,* 415 U.S. at 368, 94 S.Ct. at 1166 (citations omitted) (emphasis added). We do not know how much reach the Ninth Circuit intends to give its "procedural error" exception to its excusing of failure to raise due process claims before the BIA. However, to the extent the Ninth Circuit would excuse failure to raise a due process claim which, like Farrokhi's due process claim, does not seek to invalidate a congressional enactment, we think the Ninth Circuit's rule might go too far. Nothing appears to divest the BIA from hearing procedural due process claims that do not seek invalidation of congressional enactments.[5]

In any event, because Farrokhi's constitutional claims are without merit, we need not formulate a rule regarding whether Farrokhi's failure to raise his procedural due process violation claims before the BIA constitutes a waiver of his right to raise the claims before us. Therefore, we postpone that decision until another occasion. As to Farrokhi's claim that his conviction for passing bad checks does not satisfy the standards set forth in § 241(a)(4), the BIA decision's mention of a challenge to the substantive basis of the finding of deportability indicates that Farrokhi brought the claim to the BIA's attention and therefore has preserved his right to make the claim before us. Finally, because Farrokhi

raised it before the BIA, obviously the eligibility for amnesty claim has not been waived. We now address the substance of Farrokhi's claims.

### III

Farrokhi alleges that his deportation is invalid for two reasons. First, Farrokhi's due process rights were violated because he was without counsel during the hearing; second, Judge Barrett's reliance upon Farrokhi's passing bad checks conviction for his determination that Farrokhi was convicted of two crimes of moral turpitude was improper. Before addressing Farrokhi's due process claim, we quickly dispose of his challenge to the use of his passing bad checks conviction. Now that Farrokhi's conviction for theft has been stricken, the basis for deportation under § 241(a)(4) has vanished, at least temporarily, thereby removing the need for Farrokhi to challenge the use of his passing bad checks conviction. However, the fact remains unchanged that Farrokhi remains deportable due to his violation of § 241(a)(9). Thus, even in the absence of a basis for deportation under § 241(a)(4), Farrokhi remains deportable.

Recognizing that he "is not entitled to have counsel appointed at government expense to represent him at the hearing," *Delgado–Corea v. INS,* 804 F.2d 261, 262 (4th Cir.1986), and that his only statutory entitlement to counsel is that he has "the privilege of being represented (at no expense to the government)," 8 U.S.C. § 1252(b)(2), Farrokhi is forced to argue that his lack of representation rendered the deportation hearing so unfair that it offended the due process clause of the fifth amendment. Two glaring errors render Farrokhi's argument meritless.

First, Farrokhi explicitly waived his right to counsel. "An alien can choose to waive counsel and such a waiver will be upheld if voluntarily given." *Delgado–Corea,* 804 F.2d at 263 (citing *Barthold v.*

---

5. Indeed, we recently heard an appeal from a BIA determination that an alien's constitutional right to effective assistance of counsel had not

been denied. *See Figeroa v. U.S. Immigration & Naturalization Service,* 886 F.2d 76 (4th Cir. 1989).

*INS*, 517 F.2d 689 (5th Cir.1975)); *see also Burquez v. INS*, 513 F.2d 751, 755 (10th Cir.1975) (alien who told court that he could "speak for myself" waived "any right he may have had to counsel"). Judge Barrett said to Farrokhi: "If you can't afford Counsel, you can refer to the legal aid list, or you may speak for yourself. What do you wish to do?" Farrokhi responded: "At this point, I would like to speak for me[,] for myself." Farrokhi's waiver dissolves the necessary foundation of his lack of representation due process argument.

Farrokhi attempts to minimize the effect of his waiver in two ways. First, he claims that he desired counsel but none was available and thus he was denied his entitlement to counsel. Because he fails to support his claim with evidence from the record, we need pursue the matter no further. Second, Farrokhi argues that his waiver of his entitlement to counsel was not "willingly, intelligently, and competently made." In support of the argument, Farrokhi points to statements he made before Judge Barrett indicating that he did not understand the jurisdiction of the court and the nature of political asylum. Even if Farrokhi in fact lacked understanding of these matters, there is no reason to believe that he did not understand his entitlement to counsel and that his decision to forego counsel was not intelligently made. Accordingly, we reject Farrokhi's attempts to avoid the effect of his waiver.

■ Even if Farrokhi could explain his explicit decision to represent himself in such a way as to minimize the effects of his decision to forego counsel, he would still have to demonstrate prejudice resulting from that decision. *See Delgado–Corea*, 804 F.2d at 263 (requiring a showing of prejudice where not only did alien waive counsel but judge had provided alien with wrong list of available counsel); *see also Burquez, supra*, 513 F.2d at 754 ("the fact that an alien is without counsel is not considered a denial of due process, if he does not show that he was prejudiced thereby"). Any life remaining in his entitlement to counsel argument is therefore extinguished by the fact that, by not attending school,

he unambiguously violated his non-immigrant status as a student. *See* 8 U.S.C. § 1251(a)(9). Because the presence of counsel could not have altered the fact of the violation, Farrokhi was not prejudiced by his lack of counsel at the deportation hearing. Accordingly, we affirm the finding of deportability.

## IV

■ Farrokhi alleges error resulting from Judge Barrett's finding that Farrokhi had waived his right to apply for asylum because Judge Barrett did not provide Farrokhi with written instructions for the asylum application process. As noted above, although the argument was not raised before the BIA, we address it here because it is without merit, leaving for another day the question of whether Farrokhi's failure to raise this claim before the BIA should preclude our hearing it. We find that the procedures that Judge Barrett used were constitutionally sufficient.

As the Supreme Court has recently noted,

> [t]he constitutional sufficiency of procedures provided in any situation, of course, varies with the circumstances.... In evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures.

*Landon v. Plasencia*, 459 U.S. 21, 34, 103 S.Ct. 321, 330, 74 L.Ed.2d 21 (1982) (citations omitted). The Court also noted that

> [i]t must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature.... The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause....

*Id.* at 34–35, 103 S.Ct. at 330–31 (citations omitted).

After finding Farrokhi deportable, Judge Barrett explained to him that he might be eligible for asylum. He provided Farrokhi with an application for asylum form. He informed Farrokhi of the ten-day statutory time limit for filing an asylum form. He explained to Farrokhi what the form would request of him, including a statement in plain English that "basically, I want to see how you would be persecuted, and for what reason." Finally, Judge Barrett gave Farrokhi an additional thirteen days beyond the ten-day limit before finding that Farrokhi had waived his right to apply for asylum.

Application of the inquiry enunciated in *Landon* indicates that Farrokhi's due process challenge must fail. Admittedly, Farrokhi's interest in being able to apply for asylum is weighty. However, the procedure that Judge Barrett employed, fully informing Farrokhi of the relevant aspects of the asylum application process, provided a mechanism for Farrokhi to protect that interest; the risk of an erroneous deprivation of Farrokhi's interest in applying for asylum was low. Farrokhi argues that Judge Barrett should have provided written instructions to accompany his verbal instructions. However, given Farrokhi's extensive time in the United States (about ten years) and apparent understanding of the English language, it does not appear that Farrokhi's failure to apply for asylum resulted from an inability to understand Judge Barrett's oral instructions. Accordingly, on the facts of this case, we do not

think that Judge Barrett's decision not to put the instructions in writing created much of a risk of an erroneous deprivation or that putting the instructions in writing would have had much probable value.[6] On balance, particularly in light of our role of merely determining whether the essential standard of fairness under the due process clause is met, *see Landon,* 459 U.S. at 34–35, 103 S.Ct. at 330–31, Farrokhi's due process argument fails. In some cases, and the present case is one, the power of the spoken word suffices.[7]

## V

Farrokhi attempts to use to his advantage the amnesty provisions of the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1255a ("Act"). The Act provides that the Attorney General shall adjust the status of an alien living in the United States unlawfully to "alien lawfully admitted for temporary residence" if the alien meets certain requirements. Although the nature of the relief Farrokhi seeks from us is not obvious,[8] his argument is unavailing because it misconstrues the jurisdiction of the Immigration Judge, and, even if amnesty were properly before Judge Barrett, the BIA or us, Farrokhi has not shown that he would meet the Act's substantive requirements.

## A

Aliens seeking protection under the Act are to file an application with the Attorney General. 8 U.S.C. § 1255a(c)(1). The stat-

6. As to the final factor of assessing the burden on the government of using the additional procedures, neither party provides any data describing the extent of the burden to the government of putting the instructions for applying for asylum in writing. However, because the procedure used amply protected Farrokhi's interest, we need not consider this last factor.

7. Farrokhi's argument fails for the additional reason that the untimely asylum application that he eventually did submit was far too general. Therefore, Farrokhi can show no prejudice from the finding of waiver of his right to apply for asylum. *See Figeroa v. U.S. Immigration & Naturalization Service,* 886 F.2d 76 (4th Cir. 1989) (applicant was denied effective assistance of counsel with respect to filing an asylum application but deportation order upheld because the later-filed asylum application failed to estab-

lish *prima facie* case and therefore there was no prejudice to the applicant). *See also United States v. Cerda–Pena,* 799 F.2d 1374, 1377 n. 3 (9th Cir.1986) (alien alleging a due process violation at a deportation hearing must demonstrate prejudice resulting from the alleged violation); *Delgado–Corea, supra,* (claimant must show prejudice resulting from absence of counsel).

8. Apparently, Farrokhi hopes to rely upon 8 U.S.C. § 1255a(e)(2) which provides:

The Attorney General shall provide that in the case of an alien who presents a prima facie application for adjustment of status ... during the application period, and until a final determination on the application has been made in accordance with this section, the alien

(A) may not be deported.

utory and regulatory scheme makes it quite clear that applications for amnesty are to be brought neither to Immigration Judges nor to the BIA. *See generally* 8 U.S.C. § 1255a(c), 8 C.F.R. § 245a.2(e). If an applicant receives an adverse initial amnesty decision, his appeal lies with the Associate Commissioner, Examinations. *See* 8 U.S.C. § 1255a(f)(3), 8 C.F.R. § 245a.2(p). If the adverse decision is affirmed, the applicant is entitled to judicial review. That review shall occur "only in the judicial review of an order of deportation under section 1105a of this title." 8 U.S.C. § 1255a(f)(4)(A). Title 8 U.S.C. § 1255a(f)(4)(B) further provides:

> Such judicial review shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole.

For a variety of reasons, the statutory and regulatory scheme prevents us from granting to Farrokhi relief based on a claim of amnesty. First, Farrokhi has not shown that he has filed a timely application for amnesty. Indeed, it appears that he has never filed anything with anyone other than his submission to plaintiffs' counsel in the *Ayuda* litigation. Second, even if Farrokhi has filed a timely application for amnesty, he has demonstrated to us neither that he received an adverse initial decision, nor that he appealed it to the Associate Commissioner, Examinations. The statutory scheme envisions only one appeal to the judiciary in which the claimant is entitled to appeal both an order of deportation and the denial of an application for amnesty. On the record presented, it appears that Farrokhi has sought to bring his appeal of the deportation order before obtaining a final, or indeed an initial, judgment on his application for amnesty. Thus, to the extent Farrokhi asks us to be the first tribunal to review his amnesty application, the review scheme established by the Act requires that we deny his request.

In addition, an attempt by us to rule on whether Farrokhi has established a *prima facie* case of entitlement to amnesty would run afoul of the statutory requirement that courts hearing appeals from denials of amnesty base their decisions "solely upon the administrative record established at the time of the review by the appellate authority." Because Farrokhi does not appear to have obtained an appellate, if indeed any, decision on his amnesty application, there are no facts by which we could review his application consistent with the statutory requirement of deference to the appellate authority record.

As a jurisdictional matter, neither Judge Barrett, nor the BIA, nor we are in a position to evaluate Farrokhi's amnesty claim.

### B

Furthermore, even if there was some way to escape Congress' unambiguous requirement that we base our decision on the record developed by the appellate authority, we would still be unable to rule for Farrokhi because he has failed to demonstrate facts, from any source, making out a *prima facie* claim of amnesty eligibility. The record does not reveal whether Farrokhi resided continuously in the United States since January 1, 1982, as required by the statute, 8 U.S.C. § 1255a(a)(2)(A); whether Farrokhi's unlawful status was known to the government during that period, as required by the statute, 8 U.S.C. § 1255a(a)(2)(B); or whether Farrokhi has been physically continuously present in the United States since November 6, 1986, as required by the statute, 8 U.S.C. § 1255a(a)(3). Without commenting on whether Farrokhi is capable of satisfying these requirements, we note simply that he has not proved to us his satisfaction of these requirements.

For the foregoing reasons, the order of deportation for Anvar Farrokhi is

AFFIRMED.