PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CONSTANTIN RUSU,
                        *Petitioner,*

                    v.

U.S. IMMIGRATION & NATURALIZATION
SERVICE; JOHN ASHCROFT, Attorney
General,
                        *Respondents.*

AMERICAN IMMIGRATION LAW
FOUNDATION; AMERICAN IMMIGRATION
LAWYERS ASSOCIATION; CATHOLIC
LEGAL IMMIGRATION NETWORK,
INCORPORATED; CAPITAL AREA
IMMIGRANTS' RIGHTS COALITION;
LUTHERAN IMMIGRATION AND REFUGEE
SERVICE,
                        *Amici Curiae.*

No. 01-1776

On Petition for Review of an Order of the
Board of Immigration Appeals.
(A70-278-077)

Argued: February 27, 2002

Decided: July 22, 2002

Before WIDENER and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

_____

Petition for review denied and judgment affirmed by published opin-
ion. Judge King wrote the opinion, in which Judge Widener and
Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** Michael Joseph Begland, HUNTON & WILLIAMS, Richmond, Virginia, for Petitioner. Afsaneh Ashley Tabaddor, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Jungyoun Traci Hong, AMERICAN IMMIGRATION LAW FOUNDATION, Washington, D.C., for Amici Curiae. **ON BRIEF:** E. Marie Tucker Diveley, Turner A. Broughton, HUNTON & WILLIAMS, Richmond, Virginia, for Petitioner. Robert D. McCallum, Jr., Assistant Attorney General, Allen W. Hausman, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.

## OPINION

KING, Circuit Judge:

Petitioner Constantin Rusu seeks our review of the May 2001 Order of the Board of Immigration Appeals (the "BIA") denying his application for asylum. Order of the Board of Immigration Appeals, File No. A 70 278 077 (BIA 2001) (the "BIA Order"). Rusu contends that his video conferenced asylum hearing violated his due process and statutory rights, and that the BIA erred in declining to grant him asylum. Although we agree that his asylum hearing was conducted in a haphazard manner, we conclude that Rusu suffered no prejudice as a result thereof. We therefore deny his petition for review and affirm the BIA.

I.

Rusu fled his native Romania in 1989, allegedly out of fear of persecution by the Communist government of Nicolai Ceausescu. Rusu apparently had been an organizer for a transcendental meditation group which the Ceausescu government deemed to be subversive. Rusu contends that, as a result of his involvement in this group, he was interrogated and assaulted on multiple occasions by the Roma-

nian secret police (the Securitate) in the years preceding his flight from that country. On one occasion, the Securitate supposedly held Rusu for three days, during which they tortured him by removing his teeth with pliers and a screwdriver.

Upon escaping from Romania, Rusu travelled first to Yugoslavia and applied for asylum there. Before Rusu's status could be determined, however, war broke out in the Balkans. He then fled to Canada and applied for asylum, but his application was denied. In November 1999, he left Canada and illegally entered the United States. Shortly after arriving in this country, Rusu obtained a passport from the Romanian Embassy. In February 2000, he flew to Great Britain, but he was refused entry and forcibly returned to the United States.

Upon his return, Rusu was placed in a detention facility in Farmville, Virginia, and he was charged by the Immigration and Naturalization Service (the "INS") with being removable under § 212(a)(6)(A)(i) of the Immigration and Naturalization Act (the "INA").[1] On February 28, 2000, the INS instituted removal proceedings against him. Rusu then applied for Asylum and Withholding of Removal (the "Application") and, on September 18, 2000, an Immigration Judge (the "IJ") conducted an asylum hearing.[2] The hearing was conducted by video conference, during which Rusu remained in an INS detention facility in Farmville, while the IJ, as well as counsel for Rusu and the INS, were in a courthouse in Arlington, Virginia.[3]

---

[1]Rusu was also charged with being removable under § (2)(A)(i)(I) of § 212(a) of the INA, which provides that aliens who are convicted of crimes involving moral turpitude are inadmissible (not eligible for admission into the United States). The BIA found this charge to be without merit, and we therefore need not address it.

[2]Because Rusu filed his Application with the INS after it had instituted removal proceedings, the Application was referred to an IJ for adjudication in those proceedings. 8 C.F.R. § 208.14(c)(1). As the essence of Rusu's appeal is that he was denied a meaningful opportunity to plead his asylum claim, we characterize the proceeding before the IJ as Rusu's "asylum hearing."

[3]Pursuant to 8 U.S.C. § 1229a(b)(2)(A)(iii), a removal proceeding "may take place . . . through video conference. . . ."

Under this procedure, video cameras and television monitors were set up in both Farmville and Arlington to provide contemporaneous transmission of the hearing's images and sounds between the two sites.

Rusu's asylum hearing consumed approximately three hours, and it was plagued by communication problems. Although Rusu's best language is Romanian, he declined to accept an interpreter and chose instead to testify in English. In addition, due to his damaged mouth and missing teeth, he was unable to speak clearly. The IJ had difficulty comprehending Rusu's testimony, and on numerous occasions she stated that she could not understand Rusu and requested that he repeat himself. The court reporter was also unable to fully understand him, and the transcript of Rusu's asylum hearing testimony is marked "indiscernible" a total of 132 times. Moreover, Rusu had difficulty comprehending the questions of his counsel, Mr. Schneiderman, and the IJ, and they were often obliged to repeat themselves. Rusu also became confused when the person addressing him was not the one on camera (e.g., Schneiderman would ask a question but the camera would be focused on the IJ), and on several occasions he directed his response to the wrong person. Finally, there were technological problems with the video conference equipment. During the hearing, the IJ asked a correctional officer in Farmville to move Rusu closer to the camera, once stating "I think maybe that will help me understand him better." The IJ was also compelled to suspend the hearing at one point in order to check the quality of the equipment and its ability to record Rusu's voice.

In sum, the record reveals that the IJ and the lawyers, on the one hand, and Rusu, on the other, had difficulty understanding one another. After some effort, however, the IJ concluded that she could glean the asserted factual basis of Rusu's Application. In her decision she stated:

> We are conducting the hearing by televideo conference and had to have [Rusu] repeat some of his answers in order to understand it. We have assured ourselves however that we did understand the testimony. The testimony appears to be clear on the tape.

Oral Decision of the Immigration Judge, File No. A 70 278 077 at 5 (Sept. 18, 2000) (the "IJ Decision"). In the IJ Decision, she observed that, in order to be eligible for asylum, a petitioner must have a well-founded fear of persecution, and that such a fear must be objectively reasonable. *Id.* at 3-4. She noted that Romania had undergone substantial reform of its political process, and, pursuant to 1992 legislation, most of the former Securitate officers had been purged from the present security force.[4] She also observed that there was no evidence that individuals who either (1) engaged in transcendental meditation, or (2) were previously critical of the Ceausescu government, were currently in danger of persecution. Thus, the IJ concluded that Rusu's fear of future persecution was not well-founded. *Id.* at 7-8. In addition, while she found Rusu's claims of past persecution to be unpersuasive, she stated that, assuming their validity, he nonetheless failed to qualify for asylum as a matter of discretion.[5] *Id.* at 9-10. The IJ therefore ordered Rusu to voluntarily depart the United States or, in the alternative, to be deported. *Id.* at 12.

Rusu appealed the IJ Decision to the BIA, which dismissed his appeal on May 17, 2001. Rusu has now petitioned for our review of the BIA Order, and we possess jurisdiction pursuant to 8 U.S.C. § 1252.[6]

---

[4]The Ceausescu government was overthrown in 1989 and replaced with a constitutional democracy. The Securitate has been disbanded, and the present security force lacks the powers of arrest and detention. May 1998 Dep't of State, Bureau of Democracy, Human Rights and Labor, Romania: Profile of Asylum Claims and Country Conditions.

[5]An individual who has experienced past persecution may be eligible for asylum, even if he does not have a well-founded fear of future persecution, if the balance of equities favors a grant of asylum. *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989).

[6]In considering a petition for review such as that of Rusu, we review only "the findings and order of the BIA, not those of the IJ." *Huaman-Cornelio v. BIA*, 979 F.2d 995, 999 (4th Cir. 1992). The BIA has the power to "review an IJ's findings de novo, to make its own findings even as to matters of credibility, and to assess the legal sufficiency of the evidence." *Id.* at 998. In this case, however, the BIA made findings identical to those of the IJ. BIA Order at 3-4.

## II.

It is elementary that any judicial inquiry into the handling of immigration matters is substantially circumscribed. As the Supreme Court observed in *Landon v. Plasencia*, "control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." 459 U.S. 21, 34 (1982). Deportation and asylum hearings, however, are subject to the requirements of procedural due process. *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Yamataya v. Fisher (The Japanese Immigrant Case)*, 189 U.S. 86, 100-01 (1903); *Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1255 (4th Cir. 1995). We review de novo a claim that the procedures utilized in such hearings contravened due process or the INA. *Jacinto v. INS*, 208 F.3d 725, 727 (9th Cir. 2000). In order to prevail on a due process challenge to a deportation or asylum hearing, an alien must demonstrate that he was prejudiced by any such violation. *Gandarillas-Zambrana*, 44 F.3d at 1256-57; *Farrokhi v. INS*, 900 F.2d 697, 703 n.7 (4th Cir. 1990). Similarly, an alien must "establish prejudice in order to invalidate deportation proceedings on a claim that [his] statutory or regulatory rights were infringed." *Garcia-Guzman v. Reno*, 65 F. Supp. 2d 1077, 1085 (N.D. Cal. 1999) (citing *United States v. Cerda-Pena*, 799 F.2d 1374, 1377 (9th Cir. 1986)). And we may only find prejudice "when the rights of [an] alien have been transgressed in such a way as is likely to impact the results of the proceedings." *Jacinto*, 208 F.3d at 728; *see also Farrokhi*, 900 F.2d at 702-03.

## III.

Rusu maintains that the video conferencing procedures utilized in his asylum hearing violated due process and the INA by rendering him unable to present his case for asylum in a meaningful manner.[7]

---

[7]In performing a due process analysis, we also dispose of Rusu's statutory claims under the INA. Pursuant to 8 U.S.C. § 1229a(b)(4), an alien is entitled to (1) "the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing"; (2) "a reasonable opportunity to examine the evidence against" him; (3) a reasonable opportunity to "present evidence on [his] own behalf"; and (4) a reasonable opportunity to "cross-examine witnesses presented by the Govern-

Before addressing the merits of this contention, we will briefly examine the legal principles governing the procedural rights of asylum petitioners.

A.

In assessing whether a deportation or asylum hearing has comported with due process, we are guided by the principles of *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), in which the Court recognized that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."[8] As the Court acknowledged, what constitutes being heard at "a meaning-

---

ment." The purpose of these protections is to ensure that an asylum petitioner receives a meaningful hearing. If a petitioner is not able to examine the evidence against him, to present evidence on his own behalf, or to cross-examine witnesses to the extent of his statutory rights under 8 U.S.C. § 1229a(b)(4), then he has failed to receive a full and fair hearing consistent with due process. *Jacinto v. INS*, 208 F.3d 725, 727-28 (9th Cir. 2000) ("When these [statutory] protections are denied and such denial results in prejudice, the constitutional guarantee of due process has been denied."); *Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999).

[8]The INS maintains that *Mathews v. Eldridge* is inapplicable to Rusu's case. It observes that, while *Mathews v. Eldridge* lays out the requirements for procedural due process, i.e., the procedures the Government must observe before depriving an individual of life, liberty, or property, Rusu, as an illegal immigrant, has no legally protected liberty interest in remaining in the United States. The Government is correct on this point; Rusu has no vested "right to stay and live and work in this land of freedom." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). Nevertheless, it is well established that "[e]ven one whose presence in this country is unlawful, involuntary, or transitory is entitled to [the] constitutional protection" of the Fifth Amendment's Due Process Clause. *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). As such, an illegal alien possesses an identifiable liberty interest in being accorded "all opportunity to be heard upon the questions involving his right to be and remain in the United States" before being deported. *Yamataya v. Fisher (The Japanese Immigrant Case)*, 189 U.S. 86, 101 (1903). Although Rusu's interest is, in these circumstances, substantially attenuated, it remains a cognizable interest within the *Mathews v. Eldridge* framework.

ful time and in a meaningful manner" will have different meanings in different circumstances, and due process only "calls for such procedural protections as the particular situation demands." *Id.* at 334. Because of the Government's compelling interest in controlling immigration, hearing procedures that comport with due process in the asylum context might well be unacceptable in other proceedings. *Mathews v. Diaz*, 426 U.S. at 79-80. Nevertheless, due process requires, at a minimum, that the INS adopt procedures to ensure that asylum petitioners are accorded an opportunity to be heard at a meaningful time and in a meaningful manner, i.e., that they receive a full and fair hearing on their claims. *Jacinto*, 208 F.3d at 727; *Campos-Sanchez*, 164 F.3d at 450; *cf. Landon v. Plasencia*, 459 U.S. at 36 (observing that fair exclusion hearing for permanent resident alien must provide alien with opportunity to present case effectively); *Gandarillas-Zambrana*, 44 F.3d 1251, 1257 (4th Cir. 1995) (concluding that IJ's questioning in deportation hearing did not violate due process because it did not deprive petitioner of "fair and meaningful hearing").

### B.

Therefore, regardless of how rapidly technological improvements, such as video conferencing, may advance, the Government remains obliged to ensure that asylum petitioners are accorded a meaningful opportunity to be heard before their cases are determined. In this regard, the procedures utilized in Rusu's hearing could have resulted in the denial of a full and fair hearing on his claim. The utilization of video conferencing, although enhancing the efficient conduct of the judicial and administrative process, also has the potential of creating certain problems in adjudicative proceedings. As Chief Judge Wilkinson has appropriately observed, "virtual reality is rarely a substitute for actual presence and . . . even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it." *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir. 2001) (discussing video conferencing in sentencing proceedings). More specifically, video conferencing may render it difficult for a factfinder in adjudicative proceedings to make credibility determinations and to gauge demeanor. *United States v. Baker*, 45 F.3d 837, 844-46 (4th Cir. 1995); *Edwards v. Logan*, 38 F. Supp. 2d 463, 467 (W.D. Va. 1999) ("Video conferencing . . . is not the same

as actual presence, and it is to be expected that the ability to observe demeanor, central to the fact-finding process, may be lessened in a particular case by video conferencing. This may be particularly detrimental where it is a party to the case who is participating by video conferencing, since personal impression may be a crucial factor in persuasion.").[9]

The potential negative impact of video conferencing on a factfinder's credibility assessments may be of little consequence in certain types of proceedings. *See Baker*, 45 F.3d at 844-45 (concluding that factfinder's ability to judge demeanor and credibility have limited value in civil commitment hearing). In asylum hearings, however, findings made with respect to a petitioner's credibility are usually central to the resolution of the asylum claim. As the BIA has observed, "[i]t is well established that we attach significant weight to the credibility of an asylum applicant. A [petitioner's] consistent and detailed testimony can be sufficient to meet the burden of establishing persecution." *In Re O-D-*, 21 I&N Dec. 1079 (BIA 1998); *see also* 8 C.F.R. §§ 208.13(a) & 208.16(b) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). Moreover, the BIA accords deference to an IJ's credibility determinations, primarily because the IJ had an opportunity to personally observe the petitioner's testimony. *In Re A-S-*, 21 I&N Dec. 1106 (BIA 1998) ("[B]ecause the Immigration Judge has the advantage of observing the alien as the alien testifies, the Board accords deference to the Immigration Judge's findings concerning credibility and credibility-related issues."); *see also Matter of Burbano*, 20 I&N Dec. 872 (BIA 1994). In fact, as the Ninth Circuit has

---

[9]Rule 43 of the Federal Rules of Civil Procedure was amended in 1996 to permit video conferencing in certain circumstances, and the potential adverse impact of such technology on credibility determinations was observed in the Advisory Committee Notes. Those Notes provide, in pertinent part, as follows:

> The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition.

Advisory Comm. Notes to Fed. R. Civ. P. 43(a), 1996 Amendment.

observed, "[a]n adverse determination of [the credibility] issue, by reason of our highly deferential standard of review, would be almost insurmountable." *Kaur v. INS*, 237 F.3d 1098, 1101 (9th Cir. 2001). Put simply, an IJ's ability to judge a petitioner's credibility and demeanor plays a pivotal role in an asylum determination; an unfavorable credibility determination is likely to be fatal to such a claim.

A second problem inherent in the video conferencing of asylum hearings is its effect on a petitioner's lawyer. Because video conferencing permits the petitioner to be in one location and an IJ in another, its use results in a "Catch-22" situation for the petitioner's lawyer.[10] While he can be present with his client — thereby able to confer privately and personally assist in the presentation of the client's testimony — he cannot, in such a circumstance, interact as effectively with the IJ or his opposing counsel. Alternately, if he decides to be with the IJ, he forfeits the ability to privately advise with and counsel his client. Therefore, under either scenario, the effectiveness of the lawyer is diminished; he simply must choose the least damaging option.[11]

In addition to the problems inherent in the use of video conferencing technology, the manner of how video conferencing functioned in Rusu's hearing created additional barriers to the presentation of his case. The record reveals several instances where Rusu's difficulty in communicating with the IJ resulted from technological problems beyond his control. Specifically, the IJ at one point asked that Rusu be moved closer to the camera because she felt it might make it easier for her to understand him. On another occasion, she asked him to be moved because she was having difficulty seeing him. Moreover, there

---

[10]As coined by the novelist Joseph Heller, a "Catch-22" is a situation in which the only two seeming alternatives actually cancel each other out, leaving no means of escape from a dilemma. *See* Joseph Heller, *Catch-22* (1961).

[11]We do not suggest that a petitioner has a right to counsel in an asylum hearing. *See* 8 U.S.C. § 1229a(b)(4). Rather, to the extent asylum hearing procedures preclude a petitioner from fully exercising the privilege of counsel, that fact must be considered in determining whether he has been accorded a hearing that comports with due process. *Farrokhi v. INS*, 900 F.2d 697, 701 (4th Cir. 1990).

was some question about sound quality, as reflected in the 132 instances in the hearing transcript where Rusu's testimony was marked "indiscernible," and the IJ paused to check the sound quality during the hearing. Finally, the video conferencing technology did not permit Rusu to see everyone at the Arlington site, forcing him to converse with individuals who were not visible to him on camera.[12]

   Our acknowledgment of these problems, however, does not mean that Rusu was denied a full and fair hearing on his asylum claim. First, at least part of Rusu's inability to communicate with the IJ resulted from his decision to testify in English. As we noted previously, due process and the INA merely require that Rusu have a meaningful *opportunity* to present his claim. The INS and the courts were under no obligation to ensure that Rusu made a meaningful presentation — that was properly left to Rusu and his lawyer. Therefore, to the extent that Rusu's problems were self-inflicted, he is unable to seek relief from the judiciary. Second, in his asylum hearing, Rusu was afforded a substantial amount of time to explain the basis of his claim. Moreover, it is clear to us that, throughout the hearing, the IJ made a sincere effort to understand his testimony, and she provided him with numerous opportunities to elaborate and to clarify it. *Cf. Perez-Lastor v. INS*, 208 F.3d 773, 782 (9th Cir. 2000) ("[W]e recognize that, as a practical matter, an IJ may ameliorate the damage caused by an incompetent translation by asking for clarification or repetition."). The record demonstrates that, by the end of the hearing, the IJ understood the factual predicate for Rusu's Application. As such, although the circumstances of the asylum hearing were problematic, and they should not have been countenanced by the INS, Rusu nevertheless seems to have had an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. at 333.

---

[12]We must observe that Rusu seems a poor candidate for video conferencing. Because of his dental problems, he had difficulty speaking and communicating orally. Therefore, while video conferencing may normally impair communication to some extent, its use in this hearing appears to have compounded Rusu's communication problems.

## C.

In the final analysis, however, we need not definitely resolve whether Rusu was accorded a full and fair hearing, because he is unable, in any event, to show any prejudice resulting from a due process violation. *Farrokhi*, 900 F.2d at 703 n.7. To prevail on his contention that the video conferencing procedures violated due process, Rusu must show that better procedures are likely to have made a difference in the outcome of his hearing. *Cf. Perez-Lastor*, 208 F.3d at 780 ("In the case of an incompetent translation claim, the [prejudice] standard is whether a better translation would have made a difference in the outcome of the hearing."). Rusu, however, can make no such showing.

As we observed in *Huaman-Cornelio v. BIA*, an alien is only eligible for asylum if he is a refugee, and a refugee is "any person who is unable to return to his or her country because of 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" 979 F.2d 995, 999 (4th Cir. 1992) (quoting 8 U.S.C. § 1101(a)(42)(A)). In that decision, we further noted that "[t]he standard for proving a 'well-founded fear of persecution' is the 'reasonable person test.'" *Id.* (quoting *M.A. v. INS*, 899 F.2d 304, 311 (4th Cir. 1990) (en banc)). Therefore, an individual seeking asylum must show (1) that he has a subjective fear of persecution based on race, religion, nationality, social group membership, or political opinion, (2) that a reasonable person would have a fear of persecution in that situation, and (3) that his fear has some basis in objective reality.[13] *Id.*

---

[13]The standard for prevailing on a petition for withholding of removal is even more stringent than the standard for asylum. To qualify for withholding of removal, a petitioner must show that he faces a clear probability of persecution because of his race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic*, 467 U.S. 407, 430 (1984). As such, a determination that a petitioner fails to meet the asylum standard "necessarily means that [the] petitioner did not meet his burden on the more difficult withholding of [removal] claim." *Huaman-Cornelio*, 979 F.2d at 1000. Therefore, in concluding that Rusu could not have prevailed on his asylum claim, we also dispose of his petition for withholding of removal.

Rusu is unable to satisfy this three-prong standard for asylum eligibility. Regardless of the procedures utilized in his asylum hearing, Rusu could not have shown that former members of the Securitate would still persecute him today. Since Rusu left Romania in 1989, the Ceausescu government has fallen and the security force has been substantially reformed. Moreover, Rusu does not appear to know anything of vital interest to former security officers; his best rationale for fearing persecution is that a cabaret dancer once told him that unnamed Romanian officials were selling weapons and training troops in foreign countries. As such, a reasonable person in Rusu's circumstances would not have a well-founded fear of persecution.

Rusu is also unable to qualify for asylum based on his claim of past persecution. The BIA has recognized that victims of past persecution may occasionally qualify for asylum, even when a threat of persecution no longer exists, if the past persecution was so severe that the balance of equities favors a grant of asylum. *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989). In this case, however, no such equities exist. Rusu has no familial or other ties to this country, and, although the persecution he suffered, if his testimony is credited, was horrible, it is not of the scale warranting a grant of asylum.

Therefore, even if Rusu's asylum hearing had not been conducted in such a haphazard manner, and even if his testimony had been fully credited, he could not have prevailed on his claim for asylum. Because he suffered no prejudice from the manner in which his asylum hearing was conducted, we must sustain the decision of the BIA.[14]

---

[14]Rusu also contends that the BIA's decisions to deny his requests for asylum and for withholding of removal are not supported by substantial evidence. In analyzing such a contention, we reverse the BIA only if "the evidence presented by the petitioner 'was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution.'" *Huaman-Cornelio*, 979 F.2d at 999 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992)). A reasonable factfinder could easily find that Rusu did not qualify for asylum, because he provided insufficient evidence of a well-founded fear of persecution. As such, this challenge is without merit.

## IV.

For the foregoing reasons, we deny Rusu's petition for review, and we affirm the judgment of the Board of Immigration Appeals.

*PETITION FOR REVIEW DENIED AND*
*JUDGMENT AFFIRMED*