**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 22-1707**

LUIS ALONSO AYALA-OSEGUEDA; SANDRA LISETH MARTINEZ-DE AYALA; D.E.A.M.,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued:  October 26, 2023                    Decided:  February 1, 2024

Before NIEMEYER, QUATTLEBAUM, and RUSHING, Circuit Judges.

Petition for review denied by published opinion.  Judge Quattlebaum wrote the opinion, in which Judge Niemeyer and Judge Rushing joined.

**ARGUED:**  James Doyle Brousseau, BROUSSEAU & LEE, PLLC, Falls Church, Virginia, for Petitioners.  Remi da Rocha-Afodu, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Brian M. Boynton, Principal Deputy Assistant Attorney General, Dawn S. Conrad, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

QUATTLEBAUM, Circuit Judge:

Luis Alonso Ayala-Osegueda and Sandra Liseth Martinez-De Ayala, along with their minor son, D.E.A.M., all natives and citizens of El Salvador, claim they were threatened and harmed by local MS-13 gang members because their relative, Guadalupe Osegueda, broke up with the gang's leader, Franscisco Javier Sarabia. They also insist they will be harmed for that same reason if returned to El Salvador. As a result, they petition for review of an order of the Board of Immigration Appeals upholding the Immigration Judge's ("IJ's") oral decision denying their applications for asylum and withholding of removal.

The petition involves two central issues. First, it challenges the IJ's mixed credibility finding. Petitioners argue the IJ's adverse credibility finding was not sufficiently explicit under 8 U.S.C. §§ 1158(b)(1)(B)(iii) and 1229a(c)(4)(C). Along the way, they also argue that an IJ cannot make a mixed credibility finding. Petitioners suggest that an IJ must give either a thumbs up or thumbs down on the whole of an applicant's credibility. Second, it challenges the Board's decision to affirm the IJ's determination that petitioners did not establish a nexus between any past or feared future harm and any familial relationship.

Having considered the arguments presented and reviewed the record, we conclude that the Board did not err and that substantial evidence supports the denial of relief. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Accordingly, we deny the petition for review.

2

## I.

Before delving into the particulars of this petition, we begin with the legal background behind petitioners' claims. To qualify for asylum under the Immigration and Nationality Act ("INA"), petitioners had the burden of showing they are "refugee[s]." 8 U.S.C. § 1158(b)(1)(A); *INS v. Orlando Ventura*, 537 U.S. 12, 13 (2002) (per curiam). A "refugee" is someone "who is unable or unwilling to return to" his native country "because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group," or other protected categories. 8 U.S.C. § 1101(a)(42). An asylum applicant "may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R. § 1208.13(b).

Petitioners faced an even higher burden of proof "to qualify for withholding of removal to a particular country under the INA." *Dankam v. Gonzales*, 495 F.3d 113, 115 (4th Cir. 2007). Applicants have the burden of showing "a 'clear probability of persecution' on account of a protected ground." *Id.* (quoting *INS v. Stevic*, 467 U.S. 407, 430 (1984)). If they meet this heightened burden, withholding of removal is mandatory. *Djadjou v. Holder*, 662 F.3d 265, 272 (4th Cir. 2011). "But because the standard for withholding of removal is higher than the standard for asylum, if applicants cannot demonstrate asylum eligibility, their applications for withholding of removal will necessarily fail as well." *Id.*

Because the burden to prove both asylum and withholding of removal lies with petitioners, "the credibility of [their] testimony is often paramount." *Herrera-Alcala v. Garland*, 39 F.4th 233, 245 (4th Cir. 2022). "The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant

3

satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii).

"There is no presumption of credibility" in proceedings before the IJ, 8 U.S.C. § 1158(b)(1)(B)(iii), or before this court in considering the petition for review, *see Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021). However, if the IJ declines to give an "'explici[t]' 'adverse credibility determination,' 'the applicant or witness shall have a rebuttable presumption of credibility'" before the Board on appeal. *Id.* (quoting §§ 1158(b)(1)(B)(iii), 1231(b)(3)(C), 1229a(c)(4)(C)). Accordingly, "[a]n adverse credibility determination supported by substantial evidence generally dooms an asylum claim unless the application can prove actual past prosecution through independent objective evidence." *Herrera-Alcala*, 39 F.4th at 245. Indeed, "[a] single testimonial discrepancy, particularly when supported by other facts in the record, may be sufficient to find an applicant incredible in some circumstances." *Ilunga v. Holder*, 777 F.3d 199, 207 (4th Cir. 2015). "An adverse credibility determination is supported by substantial evidence so long as the record as a whole supports it by 'more than a mere scintilla' of evidence." *Herrera-Alcala*, 39 F.4th at 245 (quoting *Biestek v. Berryhill*, 139 S. Ct. 148, 1154 (2019)).

## II.

With that background in mind, we turn to the details of petitioners' claims. Petitioners entered the United States without inspection near Hidalgo, Texas, around November 30, 2016. Ten months later, they filed separate applications seeking asylum,

4

withholding of removal and protection under the Convention Against Torture ("CAT").[1] The applications were later consolidated.

Petitioners appeared at a removal hearing in June 2019. The adult petitioners both testified that, in 2009, their relative Guadalupe[2] dated Francisco, a leader of the local MS-13 gang. But according to petitioners, after Mr. Ayala-Osegueda's mother, Blanca, expressed her disapproval of the relationship, Guadalupe decided to end the relationship and fled to the United States to escape Francisco. Petitioners claimed that gang members tried to punish Guadalupe's relatives in retaliation for the breakup.

Ms. Martinez-De Ayala testified first. She stated that she had been threatened in El Salvador by MS-13. In particular, she said Francisco had extorted her family through three anonymous letters left under the door of a fast-food business the family started in April 2016. According to Ms. Martinez-De Ayala, the letters contained demands for money and threats to kill the family if they did not comply. She testified that she threw the letters away and did not retain copies. Ms. Martinez-De Ayala also claimed that Francisco continues to extort Blanca. In fact, Ms. Martinez-De Ayala said that the whole family would be killed by Francisco immediately upon return to El Salvador.

On cross-examination, however, Ms. Martinez-De Ayala conceded that neither Francisco nor his associates have ever stated that they sent the letters. And none of the

---

[1] Ms. Martinez-De Ayala included D.E.A.M. as a derivative applicant in her asylum application.

[2] Guadalupe is inconsistently described in the record as Mr. Ayala-Osegueda's sister, sister-in-law and niece.

letters identified that they were from Francisco or his associates. Instead, she assumed the letters came from Francisco and the gang because "they [were] the only ones in town." J.A. 145. She also conceded that the letters were delivered only after they opened the fast-food restaurant in April 2016, seven years after Guadalupe's purported breakup with Francisco.

Ms. Martinez-De Ayala was also questioned about affidavits that she and her husband submitted twelve days before their hearing. In those affidavits, both adult petitioners told a different story about what happened to Guadalupe. They stated that "[t]he family is not sure where [Guadalupe] currently is," J.A. 179, "[t]he family always believe[d] that she has been taken by MS-13 gang members," J.A. 179, and that "no one knows where she went. She just disappeared. She may have been taken by the gang members," J.A 181. But at their hearing, petitioners admitted that Guadalupe lived in Virginia—indeed, in the same town as petitioners. When cross-examined on this point, Ms. Martinez-De Ayala said, "Maybe [the statements in the affidavits were] a mistake." J.A. 146.

Finally, Ms. Martinez-De Ayala testified that her husband had been attacked by four unknown assailants shortly before the family left El Salvador in November 2016. When cross-examined on her statement in her affidavit that the attack instead occurred in October 2016, the IJ "advise[d] [her] not to look at the other witness in this case for assurance." J.A. 147. The IJ then turned to Mr. Ayala-Osegueda, and stated, "And you too, sir. I see you nodding back and forth to the respondent. That is disfavored by this court. You cannot communicate with the witness on the witness stand. It does affect the court's assessment of the credibility in this case." J.A. 147.

6

After that, Mr. Ayala-Osegueda testified. He first stated that he was attacked by four people on his way to work in October 2016. The attackers told him that if he "did not pay what they were asking [him] to pay, they would kill [his] wife, [his] son, and [him]." J.A. 156. He had never seen the four attackers before and could not identify them. On cross-examination, he conceded that none of the assailants mentioned Guadalupe when they attacked him and that he wrote in his asylum application that he believed they beat him up because he owned a restaurant.

After the hearing, the IJ denied all of petitioners' claims. First, the IJ found petitioners' testimony that Guadalupe's relationship led to retaliation not credible. Because of its importance to our analysis, we quote the IJ's entire discussion of this issue:

> After careful examination of the record of evidence and considering the totality of the circumstances and all relevant factors, the court makes a mixed finding on credibility here today.
>
> The court is mindful and concerned about the issues raised by the government in this case—specifically the very many material inconsistencies between testimony under oath here today and statements made in the respondents' affidavits. There are very distinct discrepancies between about what happened to their niece or sister-in-law, Guadalupe, and, significantly, the whereabouts of Guadalupe. The written affidavits, which were tendered a couple of weeks ago, said that nobody knew where she was, and people suspected that she was taken away by gang members. That is untrue. Guadalupe apparently left for the United States some time ago and has been known to be in Virginia for some time. The respondent has been in touch with Guadalupe on more than one occasion since she's been in the United States. And both the respondents and their niece, Guadalupe, live in the same city, in Sterling, Virginia. The court is gravely concerned about the discrepancy on that particular fact as, if it was true that Guadalupe was missing at the hands of the gang, it creates a very different scenario. And the court finds in this case that there was an attempt to deceive the court in terms of what actually happened to the niece, and that she is alive and well. As will be noted momentarily, it's also significant to the court that Guadalupe did not offer anything material to the court to corroborate the accounts of either

7

of the respondents when she is present in the United States, in Sterling, Virginia, and in contact with the respondents. Both of the respondents perpetuated this falsity in their written affidavits, and it gravely affects the level of weight that the court will afford to the respondents' testimony in this case. The court noted during the course testimony that the respondents were communicating during testimony, one signaling the other that a date was correct or that it should be changed. Having made all those findings and recognizing that the weight of the respondents' testimony is minimal in this case, the court will decline to make a completely adverse credibility finding in this case.

J.A. 61–62.

The IJ then noted the lack of corroborative evidence. Particularly striking to the IJ was petitioners' lack of evidence from Guadalupe, "whose relationship with the gang member was presented as central to their claim," the absence of "medical evidence or photographs" concerning Mr. Ayala-Osegueda's injuries from the attack and the failure of petitioners to produce "copies of the notes" documenting any threats received. J.A. 62.

The IJ found that petitioners had not met their burden to seek protection based on membership in a particular social group ("PSG"). Mr. Ayala-Osegueda argued two PSGs: the "son of Blanca" and "an El Salvadorian who owns a fast food restaurant." J.A. 62. Similarly, Ms. Martinez-De Ayala argued two PSGs: the "spouse of Luis" and "small business owner in El Salvador." J.A. 63. The IJ found petitioners' business-oriented PSGs not cognizable because they were "not immutable," "not defined with sufficient particularity" and not "socially distinct." J.A. 62–63. And after finding that the family-based PSGs[3] were cognizable, the IJ found that petitioners failed to establish "a nexus

---

[3] We note, however, the lack of clarity as to the framing of both family-based PSGs. Based on the offered PSGs, persecution on account of a familial relationship appears to

8

between the alleged harm and a protected ground." J.A. 63. Instead, the IJ found, based on all the credible evidence, that petitioners were targeted because of monetary motivations. Therefore, the IJ found that petitioners were not entitled to a rebuttable presumption of a well-founded fear of future persecution.

The IJ also found that petitioners had not shown a well-founded fear of future persecution. Beyond showing a "subjectively genuine fear," the court noted that Blanca—Luis's mother—still lived in El Salvador, unharmed. J.A. 64. Because there was no evidence to show they met the burden for asylum, the IJ also found that petitioners failed to demonstrate their eligibility for withholding of removal—an even higher evidentiary burden.[4]

Following petitioners' timely appeal, the Board adopted and affirmed the IJ's denial of the requested relief. First, the Board affirmed the IJ's "determination that the

_____

hinge on Blanca, not Guadalupe, which is surprising given how much time is spent debating testimony about Guadalupe. Indeed, one might have expected Mr. Ayala-Osegueda to assert "uncle of" or "brother to Guadalupe," instead of "son of Blanca." Still, we assume this PSG seeks to capture the familial relationship *through Blanca* to Guadalupe. That is, stating "son of Blanca" and "spouse of Luis" indirectly references the familial relationship to Guadalupe and the alleged retaliation against the family because of the breakup. *See* J.A. 60 ("The respondents believed that the threats were from members of MS-13, and they base that on the fact that one of their relatives had purportedly, seven years prior, been involved with a specific MS-13 member who was then and is currently incarcerated in El Salvador."). Alternatively, it is possible—but we assume less likely—that "son of Blanca" captures the fact that the retaliation against the family could stem from Blanca's own actions: the disapproval of Guadalupe's relationship with Francisco. In any event, because the parties do not dispute this lack of clarity, we do not resolve it.

[4] The IJ also found that petitioners' CAT claim failed because they "failed to show that its more likely than not that they would be subject to torture" if they returned. J.A. 64.

9

respondents have not established a nexus between any past or feared future harm and a protected ground." J.A. 3. The Board held that petitioners identified no clear error of fact with the IJ's decision, and made no argument on appeal that would disturb the IJ's denial of relief.

Next, the Board rejected petitioners' argument that the IJ was unclear in its credibility finding as the IJ "provided specific reasons for [its] mixed finding on credibility." J.A. 4. The Board noted that the IJ was concerned about "material inconsistencies" in testimony and affidavits. J.A. 4. In particular, the Board recognized that the IJ was concerned with several discrepancies as it relates to Guadalupe. The Board also noted the IJ's concerns over conflicting testimony about Guadalupe's whereabouts and that there had been an attempt to deceive the court. On top of a "lack of corroborating evidence," the Board also recognized the IJ's note that "the adult respondents were attempting to communicate by signaling with each other." J.A. 4. Finally, the Board confirmed that the IJ "declined to make a complete adverse credibility finding." J.A. 4.

As a result, the Board dismissed the appeal.

III.

In seeking our review of the Board's decision, petitioners make two main arguments. First, they challenge the IJ's "mixed credibility finding." According to petitioners, the IJ's credibility finding was not "explicit" as required by 8 U.S.C. §§ 1158(b)(1)(B)(iii) and 1229a(c)(4)(C). They also argue that those statutes do not permit an IJ to make a mixed credibility finding. Instead, petitioners suggest an IJ must assess an

10

applicant's credibility wholesale, as an all or nothing proposition. For these reasons, they claim that they did not receive the presumption of credibility to which they were entitled before the Board. Second, petitioners challenge the Board's decision to affirm the IJ's determination that they did not establish a nexus between any past or feared future harm and their relationship to Guadalupe.[5] We address these issues in turn.

## A.

### 1.

The issue of whether the IJ "explicitly made" an "adverse credibility determination" under 8 U.S.C. §§ 1158(b)(1)(B)(iii) and 1229a(c)(4)(C) is a legal question that we review de novo. *Takwi v. Garland*, 22 F.4th 1180, 1186 (10th Cir. 2022); *see Salem v. Holder*, 647 F.3d 111, 115 (4th Cir. 2011) ("We review legal questions de novo.").

We have no binding authority on what an IJ must say to explicitly make an adverse credibility finding.[6] And recently, the Supreme Court left "for another day the question [of] what the factfinder must say or do to furnish an explici[t] adverse credibility determination." *Ming Dai*, 141 S. Ct. at 1679 (internal quotation marks omitted).

---

[5] Petitioners do not challenge the Board's affirmance of the denial of CAT relief or its affirmance of the IJ's determination that "an El Salvadorian who owns a fast food restaurant" and "small business owner in El Salvador" are not legally cognizable particular social groups.

[6] Our unpublished decision in *Yan Dan Li v. Gonzales* held that "[f]or an IJ's credibility finding to be explicit, the IJ must state in no uncertain terms that he finds that the applicant's testimony is or is not credible; a passing reference implying doubt about an applicant's credibility simply will not do." 222 F. App'x 318, 323 (4th Cir. 2007) (internal quotation marks omitted).

11

To consider petitioners' argument that the IJ here failed to make the required explicit finding, therefore, we begin with the text of the relevant statutory provisions. "There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii) (asylum proceedings); *id.* § 1229a(c)(4)(C) (removal proceedings). So what does it mean to be "explicitly made"? To determine a statute's meaning, dictionaries from around the time of the statute's enactment can provide guidance. *United States v. Helton*, 944 F.3d 198, 207 (4th Cir. 2019). And here, relevant dictionaries define "explicit" as "[f]ully and clearly expressed; leaving nothing implied," American Heritage Dictionary of the English Language (3d ed. 1996), or "fully revealed or expressed without vagueness, implication, or ambiguity: leaving no question as to meaning or intent," Merriam-Webster's Collegiate Dictionary (11th ed. 2003). These definitions leave language with many avenues to explicitly reject credibility. Thus, we join other circuits in holding that an IJ is not bound to using particular "magic words" when making an explicit adverse credibility finding. *Molina-Diaz v. Wilkinson*, 989 F.3d 60, 65 (1st Cir. 2021); *Takwi*, 22 F.4th at 1187; *Islam v. Holder*, 368 F. App'x 241, 243 (2d Cir. 2010) (summary order).

Not searching the decision for any magic words, we look instead to the substance of what the IJ said. Up front, the IJ said, "the court makes a mixed finding on credibility today." J.A. 61. There is nothing equivocal about that language. Through that statement,

12

the IJ fully and clearly expressed its finding, without vagueness, implication or ambiguity.[7] That alone satisfies the statutory requirement of an explicit credibility determination.

And as to exactly what was found incredible, the IJ's description of the scope of and reasons for the determination was likewise sufficiently clear. When reviewing the testimony concerning Guadalupe, the IJ found "very distinct discrepancies" between testimony and "untrue" written affidavits, had "grave[] concern[s] about the discrepancy" and determined there had been "an attempt to deceive the court" and to "perpetuate[] falsity in their written affidavits." J.A. 61–62. It is hard to imagine an IJ using more determinative language than classifying testimony as "untrue," a "falsity" or "an attempt to deceive the court." J.A. 61–62.

The IJ "explicitly made" an adverse credibility finding about petitioners' testimony on retaliation stemming from Guadalupe's breakup with Franscisco. So, we reject petitioners' claim that the IJ's mixed adverse credibility finding was not explicit.

---

[7] The explicit nature of the IJ's language is confirmed when compared to language in other cases that courts of appeals have deemed sufficient to constitute an adverse credibility determination. *See Some v. Gonzales*, 183 Fed. App'x 4, 8 (1st Cir. 2006) (characterizing testimony as a "phenomenal gross exaggeration" and stating that petitioner's claims "lacked credibility" constitutes an explicit adverse credibility determination); *Islam v. Holder*, 368 Fed. App'x 241, 243 (2d Cir. 2010) (summary order) (referencing the "implausib[ility]" of testimony constitutes an explicit adverse credibility determination); *Chugh v. Gonzales*, 130 Fed. App'x 201, 201 (9th Cir. 2005) (memorandum opinion) (expressing a lack of "faith" that a petitioner "has actually done what he has stated," and finding that he "made up and memorized" events constitutes an explicit adverse credibility determination).

13

2.

Petitioners lodge a second complaint about the IJ's mixed credibility finding. They insist a mixed finding is inherently improper. According to petitioners, credibility is an all or nothing concept, to be applied wholesale to the applicant's entire testimony. *See* Op. Br. 23 ("[A]n applicant's testimony is either credible or is not credible."); *see also* Op. Br. 21 ("[A]n IJ has only three options when it comes to a credibility determination: (1) make an explicit adverse credibility determination[;] (2) make an explicit determination that the applicant is credible; or (3) make no explicit credibility determination at all, in which case the applicant is afforded a rebuttable presumption of credibility on appeal[.]" (internal quotation marks omitted)).

The statutes do not support this view. Nothing in the statutes prohibits a mixed credibility finding—deeming an applicant's testimony credible as to one subject but not another. Indeed, although we have not directly expressed approval, we have acknowledged IJ decisions that have done just that, without correction. *See Cordova v. Holder*, 759 F.3d 332, 336 (4th Cir. 2014) ("The IJ found Aquino's testimony 'credible in part and not credible in part.'"); *Wambura v. Barr*, 980 F.3d 365, 375 (4th Cir. 2020) ("[T]he IJ gave Wambura a mixed credibility finding."). And the statute's award of "a rebuttable presumption of credibility on appeal" does not imply such a prohibition. 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1229a(c)(4)(C). In the case of a mixed credibility finding, a presumption of credibility should be applied by the Board on appeal concerning the portion of testimony not explicitly determined incredible.

14

Along with lacking support in the statutory language, prohibiting a mixed credibility finding would uniquely limit IJs unlike other factfinders. In courtrooms across the country, triers of fact can and regularly do find parts of testimony credible and other parts incredible. Indeed, federal courts typically instruct juries that they may do just that. *See* 3 Fed. Jury Prac. & Instr. § 101:43 (6th ed.) ("In deciding the facts, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, part of it, or none of it."). We see no reason to treat IJs differently.

And imagine if we adopted petitioners' argument. If an IJ found part of a petitioner's testimony credible but part not, what is the IJ supposed to do? Declare all of the testimony incredible even though only some of it was or declare it all credible even though some was not? Petitioners' proposed rule would force a blanket determination at odds with the way the IJ actually viewed the testimony.[8]

Indeed, the Supreme Court's recent *Ming Dai* decision found no reason to treat the agency factfinders differently from any other reasonable factfinder. In discussing the Board's authority, the Court stated that an "agency, like any reasonable factfinder, is free to credit part of [a] witness' testimony without necessarily accepting all of it. It does not matter whether the agency accepts all, none, or some of the alien's testimony; its reasonable findings may not be disturbed." *Ming Dai*, 141 S. Ct. at 1677 (internal quotation marks and citations omitted).

---

[8] Of course, so long as supported by specific and cogent reasons, IJs can make adverse credibility determinations concerning a witness's entire testimony.

15

Thus, an IJ may make a partial or mixed adverse credibility determination so long as substantial evidence supports it. *See Paul v. Gonzales*, 444 F.3d 148, 154–57 (2d Cir. 2006) (reviewing a "bifurcated" or "mixed" credibility finding where the IJ believed some aspects of the alien's claim but not others). An IJ is not bound to make its adverse credibility determination wholesale, for the alien's entire testimony.

Here, the IJ properly made a "mixed" finding about credibility. After finding the testimony about retaliation due to Guadalupe's breakup incredible, the IJ nevertheless "decline[d] to make a completely adverse credibility finding." J.A. 62. That suggests the IJ found the remaining parts of petitioners' testimony credible. And on appeal, there is no indication the Board did not apply a presumption of credibility to such other testimony, as it must. It certainly reviewed in detail the reasons why no presumption of credibility applied to petitioners' testimony concerning retaliation following Guadalupe's breakup with Francisco.

3.

Last, it is important to clarify what applying the presumption of credibility means and what it does not mean. Just because testimony is presumed credible does not mean that the Board must accept it as true or that an applicant will prevail on appeal. *See Ming Dai*, 141 S. Ct. at 1681 ("It's not always the case that credibility equals factual accuracy, nor does it guarantee a legal victory."). Such a presumption "applies *only* with respect to credibility." *Id.* at 1680 (emphasis in original). The "INA expressly distinguishes between credibility, persuasiveness, and the burden of proof." *Id*. And "[i]n order for an alien's testimony to carry the day on its own, the statute requires the alien to satisfy the trier of

16

fact on all three counts—showing his 'testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee.'" *Id.* (quoting §§ 1158(b)(1)(B)(ii), 1231(b)(3)(C), 1229a(c)(4)(B)). The Board "may weigh the credible testimony along with other evidence of record." *Id.* (internal quotes omitted). "Accordingly, even if the [Board] treats [petitioners'] evidence as credible, the agency need not find [their] evidence persuasive or sufficient to meet the burden of proof." *Id.*[9]

That is what happened here. Even accepting petitioners' belief that they suffered past persecution on account of their relationship to Guadalupe, the Board affirmed the IJ's rejection of that position. The Board held that petitioners "have not established a nexus between any past or feared future harm and a protected ground." J.A. 3. As result,

---

[9] Writing for a unanimous Court in *Ming Dai*, Justice Gorsuch offered an illustration of this principle:

> Suppose a plaintiff is doing her best to recount a car accident to prove her case for damages. She testifies earnestly that she thought the traffic light was green when she entered an intersection. The plaintiff says she was then broadsided by the defendant who was traveling on a cross street and ran a red light. Later in the proceedings, however, the defendant presents video footage and the testimony of other witnesses, all of which show that it was really the plaintiff who drove through a red light and the defendant who had the right of way. It's easy enough to imagine that a factfinder might not describe the plaintiff as lacking credibility—in the sense that she was lying or not "worthy of belief," Black's Law Dictionary 448 (10th ed. 2014) (defining "credibility")—yet find that her testimony on a key fact was outweighed by other evidence and thus unpersuasive or insufficient to prove the defendant's liability.

*Id.* at 1681.

17

petitioners' argument about the IJ's explicit adverse credibility determination and credibility presumption on appeal fails.[10]

B.

Petitioners also challenge the factual determination that they were threatened for pecuniary gain alone as unsupported by substantial evidence. But because a reasonable adjudicator would not be compelled to conclude to the contrary, we disagree.

After finding petitioners' family-based PSGs cognizable, the IJ found that petitioners failed to establish a nexus between their PSGs and the persecution they suffered. Relying on "all of the facts and credible evidence," the IJ ruled that petitioners were targeted by unknown individuals who sought money from their business and family. J.A. 63. And, as already noted, the Board affirmed the IJ's determination that petitioners did not establish a nexus.

---

[10] Petitioners additionally argue that substantial evidence does not support the agency's adverse credibility determination. In particular, petitioners challenge the substance of the IJ's adverse credibility determination, arguing that "questionable" affidavits that were unscrupulously prepared by petitioners' prior counsel and were "immediately disclaimed by Petitioners upon questioning during their testimony" tainted petitioners' credibility. Op. Br. 26–28. Petitioners also suggest that the IJ's conduct during the proceeding "created an environment where Petitioners' credibility would be called into question." Op. Br. at 28. These arguments fail for at least two reasons. First, petitioners have not exhausted their claims, as these arguments were not presented to the Board below. *See Tepas v. Garland*, 73 F.4th 208, 213 (4th Cir. 2023); *Hernandez-Portillo v. Garland*, No. 22-1587, 2023 WL 5951013, at *1 (4th Cir. Sept. 13, 2023). Second, even if exhaustion were excused, these arguments fail on the merits. The IJ identified specific and cogent reasons for rejecting petitioners' testimony about Guadalupe. *See Djadjou*, 662 F.3d at 273. Indeed, the effect of inconsistencies along with petitioners' nonverbal communications to influence testimony provide a sufficient basis for an adverse credibility determination, setting aside any unscrupulously prepared affidavits. *See id.* at 273–74. Additionally, petitioners' arguments about the IJ's "improper" conduct likewise fail. A review of the record does not reveal the conduct petitioners complain of.

18

According to petitioners, a reasonable adjudicator would be compelled to disagree because there were "multiple intertwined reasons why the MS-13 began threatening Petitioners," including family ties, and not just the "immediate trigger" of getting money. Op. Br. 37. In particular, petitioners argue that the IJ's finding—that the central motivation behind the alleged harm to petitioners was pecuniary and not due to Guadalupe breaking up with Francisco—is not supported by substantial evidence.

But this argument fails because petitioners have not shown that reversal is compelled based on the record. We review a BIA decision based on a factual determination for substantial evidence. *Dankam v. Gonzales*, 495 F.3d 113, 119 (4th Cir. 2007). Under this "highly deferential" standard of review, *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020), we must look only to the administrative record "on which the order of removal is based" and consider the findings of fact "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(A)–(B). So, in order "[t]o reverse the [Board]'s finding, we must find that the evidence not only *supports* that conclusion, but *compels* it." *Elias-Zacarias*, 502 U.S. at 481 n.1 (emphasis in original). Said differently, "we must uphold the [Board]'s finding unless no rational factfinder could reach the same conclusion." *Temu v. Holder*, 740 F.3d 887, 891 (4th Cir. 2014). The record does not compel us to disagree with the Board's determination that petitioners did not establish a nexus between any past or future harm and a protected ground.

Take Ms. Martinez-De Ayala's testimony on the extortionary letters. She testified that the letters were anonymous and that she merely "suspect[ed]" that they were from

19

Francisco and the gang. J.A. 144. But neither Francisco nor his associates ever stated that they were the ones behind the letters, and the anonymous writers never identified themselves as gang members. One thing the letter writers did say, however, is that "they wanted money." J.A. 150.

And regarding the attack by the unknown assailants, Mr. Ayala-Osegueda testified that he had thought that they attacked him because he owned a restaurant. And because the attack happened on his way to work at the fast-food business, Mr. Ayala-Osegueda agreed that it would be fair to say that the assailants might have thought he had cash on hand. This evidence accords with Mr. Ayala-Osegueda's asylum application, *see* J.A. 234 ("I believe they targeted me because I owned a business and had money."), and Ms. Martinez De-Ayala's application, *see* J.A. 328 ("I owned a small fast food stand since April 2016 so therefore they though [sic] I had money, which is why they targeted me.").

Next, consider the timing with respect to the extortionary notes and attack. While Ms. Martinez De-Ayala testified that the alleged relationship between Francisco and Guadalupe ended in 2009, it was not until October 2016 that petitioners were targeted. And more importantly, it was not until *after* April 2016—when petitioners began their fast-food business—that anyone began demanding money from them. We have previously held that "[t]he timing of threats can be relevant in determining a persecutor's motivation." *Toledo-Vasquez v. Garland*, 27 F.4th 281, 287 (4th Cir. 2022) (internal quotation marks omitted). Here, the timing of petitioners' persecution indicates it was motivated by criminals seeking the family's money, since the threats to petitioners never occurred before they started the fast-food business.

20

Finally, some of the PSGs articulated by petitioners' counsel at the hearing imply that petitioners were persecuted because of a pecuniary motivation. There, counsel asserted that Ms. Martinez De-Ayala sought protection under the INA based on membership in a PSG defined as "small business owner" and "fast food business owner in El Salvador," while Mr. Ayala-Osegueda sought protection based on membership in a PSG defined as "Salvadorian who own[s] a fast food restaurant." J.A. 140–41. Persecution in the form of extortion due to ownership of a business appears to be a concession that petitioners were being targeted for pecuniary reasons.

The record evidence does not compel a ruling contrary to the administrative factual finding that petitioners were targeted for pecuniary reasons. In fact, besides their subjective belief, petitioners point to no evidence that Guadalupe's breakup with Francisco was a reason for the harms they suffered. Petitioners' claim of "multiple intertwined reasons" was therefore appropriately considered and rejected by the IJ for specific and cogent reasons. A reasonable adjudicator would not be compelled to conclude otherwise. Despite the difficult circumstances that impelled petitioners to flee El Salvador, substantial evidence supports the Board's conclusion that they were not persecuted on account of their family-based PSG. Thus, we deny the petition for review on this ground.[11]

---

[11] Petitioners also argue that the IJ erred by failing to include any explanation for the absence of corroborating evidence. It is true that a petitioner "is entitled to an opportunity to explain why he cannot reasonably obtain any evidence sought by the IJ, and the IJ is required to include that explanation in the record, along with a finding as to whether the explanation is sufficient." *Chen v. Garland*, 72 F.4th 563, 571 (4th Cir. 2023); *see also Wambura*, 980 F.3d at 372 ("[T]he BIA held the applicant should be given an opportunity to explain why he could not obtain such evidence and that explanation should be included

IV.

For the reasons discussed above, we deny the petition for review of the Board's decision.

*PETITION DENIED*

---

in the record as well as whether the explanation was sufficient."). But any omission by the IJ was harmless. "[T]o prevail on a due process challenge to a deportation or asylum hearing, an alien must demonstrate that he was prejudiced by any such violation." *Rusu v. U.S. I.N.S.*, 296 F.3d 316, 320 (4th Cir. 2002). Accordingly, petitioners must "establish prejudice in order to invalidate deportation proceedings on a claim that [his] statutory or regulatory rights were infringed." *Id.* (citation omitted). To that end, we will find prejudice "when the rights of [an] alien have been transgressed in such a way as is likely to impact the results of the proceedings." *Id.* (citation omitted). Because substantial evidence supports the IJ's nexus determination and application denial, petitioners cannot show that any error in not documenting explanations for the record impacted the proceedings.